PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW D. RUBLE, | ) | CASE NO:  5:09CV02173 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| TIMOTHY E. ESCOLA *et al.*, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** (Resolving ECF Nos. 37, 38, and |
| Defendants. | ) | 42) |

(5:09CV02173)

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   A. The Burglary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   B. The Investigation of Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      1. The Photo Line-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      2. The Arrest Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   C. The Arrest of Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   D. Plaintiff's Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. Discussion:  Constitutional Law Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   A. Deprivation of a Constitutional Right:  False Arrest and False Imprisonment . . . . . 13
      1. Establishing a Claim of False Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         a. Fourth Amendment Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         b. Role of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      2. Defendants Could Not Rely Upon Griffin's Statements . . . . . . . . . . . . . . . . . 14
      3. Garletts' Photo Line-up is Improper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      4. The Warrant Was Not Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
         a. England Violated Plaintiff's Constitutional Right . . . . . . . . . . . . . . . 20
         b. Escola Did Not Violate Plaintiff's Constitutional Right . . . . . . . . . .
         21
      5. The Constitutional Right Was Clearly Established . . . . . . . . . . . . . . . . . . . . 22
   B. Deprivation of a Constitutional Right:  Malicious Prosecution . . . . . . . . . . . . . . . 23
      1. Establishing a Claim of Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . . 23
      2. Probable Cause for the Criminal Prosecution . . . . . . . . . . . . . . . . . . . . . . . . 24
   D. Perry Township's Policy or Custom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      1. "Official Policy" Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         a. Ohio Revised Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         b. Local Practice and Custom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      2. The Policy:  Inadequate Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      3. The Policy:  Inadequate Supervision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      4. The Policy:  Inadequate Hiring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV. Discussion:  State Law Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   A. State Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   B. False Arrest/False Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   C. Malicious Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   D. Abuse of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
   E. Intentional Infliction of Emotional Distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   F. Defamation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   G. Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(5:09CV02173)

Plaintiff Matthew Ruble ("Ruble" or "Plaintiff") filed the present action against Defendants former Chief of Police for the Perry Township Police Department Timothy Escola ("Escola"), former part-time police officer Janine England ("England"), and the Board of Trustees for Perry Township, Stark County, Ohio ("Perry Township") (collectively "Defendants"), claiming ten causes of action pursuant to 42 U.S.C. § 1983 and Ohio State law.[1] ECF No. 16. Defendants removed the case to this Court on September 18, 2009 on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441. ECF No. 1.

Before the Court are Defendants' motions for summary judgment, pursuant to Fed. R. Civ. P. 56(c). ECF Nos. 37, 38, 42.

For the reasons that follow, the Court denies in part Defendant England's motion for qualified immunity and state immunity. The Court grants Defendant Escola's motion for qualified immunity and remaining summary judgment motion and grants Perry Townships' motion for summary judgment.

## I. Background

### A. The Burglary

The events giving rise to this case began when Defendant England, a newly hired part-time Perry Township police officer, was dispatched to a private home to investigate a reported burglary.[2] ECF No. 16 at 3. Several days after the investigation, the burglary victim reported

---

[1] Timothy Escola was Chief of Police with Perry Township Police Department from May of 2005 until June of 2009. ECF No. 32 at 5.

[2] At this point, England was "an officer in training" and accompanied by Officer Jason Fisher. ECF No. 32 at 19. She had recently been hired by Escola. ECF No. 32 at 6. Plaintiff

3

(5:09CV02173)

that an unauthorized person cashed one of his personal checks.  ECF No. 16 at 3.  A copy of the

personal check and a surveillance photograph revealed that Richard Griffin had fraudulently

cashed the victim's check.  ECF No. 16 at 3.  Escola and England presented a photo line-up to

the bank teller, Julia LeFever, who positively identified Griffin.  ECF Nos. 16 at 3; 32 at 21; 36

at 19.

After obtaining a positive photograph identification, England located Griffin outside his

apartment, advised him of his *Miranda* rights, and questioned him about the personal check and

the burglary.  ECF Nos. 16 at 4; 36-5.  Griffin claimed that he received the personal check in

exchange for the sale of a four-wheeler.  ECF Nos. 16 at 4; 36-5.  Immediately thereafter, Griffin

revised his response by admitting that he was a heroin addict and cashed the check to purchase

heroin.[3]  ECF Nos. 16 at 4-5; 36-5.  When asked about the burglary, Griffin "adamantly denied

any involvement and said [that] he was at work.  Again, very quickly [Griffin] recanted his story

and told [Officer England that] he drove Matthew Ruble to the home . . . and Matthew went into

the home while [Griffin] was on the 'look out.'"  ECF Nos. 16 at 5; 36-5.  The next day, Griffin

completed a written statement and, thereafter, was arrested and booked.  ECF Nos. 16 at 5-6; 36-

---

alleges an inappropriate relationship between the two started shortly after England's hiring based
upon the amount of time the two were spending together and documented emails between them.
ECF No. 43 at 2-3.  Escola testified that there were rumors around the police department that
they were having an affair.  ECF No. 32 at 16.  England, when asked about rumors of an affair,
did not recall such rumors but added "[a]ll I do know is that it was very evident that there were
females I worked with [that] had a very serious issue with me" but she did not know why.  ECF
No. 36 at 13.  Escola and England deny they were having an inappropriate relationship, the sole
exception being the events that occurred on the return trip from Cincinnati.  ECF Nos. 32 at 15;
36 at 60.

[3]  England's police report notes that Griffin was "visibly crying and holding his face in
his hands when he said, 'I need help, please get me help for my habit.'"  ECF No. 36-5.

4

(5:09CV02173)

5.

### B. The Investigation of Plaintiff

Upon information and belief of his criminal involvement in the burglary, Escola and England began to investigate Plaintiff. Plaintiff's criminal history showed only traffic violations. ECF Nos. 16 at 6; 32 at 30; 36 at 29. The officers spoke with several witnesses regarding Plaintiff's alleged criminal activities. ECF Nos. 32 at 30-31; 36 at 38. In contrast to the near meticulous records kept in the Griffin investigation,[4] the officers testified that neither documented the witnesses' names or addresses, nor did they take a written statement or include the information in the police report. ECF Nos. 32 at 31; 36 at 31, 36, 38.

Plaintiff contacted the Perry Township Police and informed England, *via* telephone, that he resides in Cincinnati, Ohio and works at Ziegler Tire in Monroe, Ohio. ECF Nos. 16 at 6; 36 at 29, 36. Plaintiff spoke to England and agreed to meet with her over the weekend to avoid missing work. ECF Nos. 16 at 6; 36 at 36. England did not document her conversation with Plaintiff, and Plaintiff failed to attend the meeting. ECF No. 36 at 36. The plant manager at Ziegler Tire faxed Plaintiff's time cards to Escola, indicating Plaintiff was at work the day of the burglary, and also included a written note inviting the officers to telephone the plant if the

---

[4] *See* ECF Nos. 32-3 (incident report); 32-4 (narrative supplement); 32-5 and 32-6 (narrative supplement); 32-8 (copy of forged personal check); 32-9 (surveillance camera photograph); 32-10 and 32-11 (bank teller photo line-up form); 32-12 (bank teller's statement); 32-14 (description of Griffin); 32-15 (Griffin's criminal history); 32-17 (Griffin's background information); 32-23 (statement from Griffin's ex-girlfriend explaining that Griffin currently drives her blue Dodge Neon automobile); 32-25 (copy of forged personal check); 32-26 (copy of forged personal check); 32-27 (copy of forged written check); 36-27 (Griffin's statement regarding burglary); 36-28 (Griffin's statement admitting that he forged five personal checks).

5

(5:09CV02173)

officers had any questions.  ECF No. 44 at 7.  The officers did not telephone the plant manager

to verify the time cards.  ECF No. 44 at 7.  What happened next is in dispute.

### 1. The Photo Line-Up

England returned to the neighborhood where the burglary occurred to canvass the area

and talk to the neighbors in accordance with Escola's instruction.  ECF Nos. 32 at 35-36; 36 at

42.  England independently assessed a photo line-up with Garletts.  ECF No. 36 at 42.  During

the photo line-up, Garletts allegedly communicated to England that she "was doubtful for several

reasons:  I couldn't see his face, it was far away and there was a tree in the way."  ECF No.  34

at 6.  Despite Garletts' doubt, England instructed Garletts to "put down a percentage as to how

sure you are."  ECF No. 34 at 14.  Garletts wrote, "I would have to say I'm about 80 to 90

percent sure this is the person I saw."  ECF Nos. 34 at 14; 36-35.

In contrast, England testified that Garletts "absolutely" did not indicate that she had

difficulty making the selection.  ECF No. 36 at 45.  In her narrative report of the photo line-up,

England wrote the following:

> I compiled a photo line up of six white males in their late twenties and presented
> the line up to Theresa Garletts.  Within the first five seconds Theresa picked out
> Matthew D. Ruble as who she witnessed walk up to the residence that was
> burglarized on the 13th of May 2009.  In speaking with Teressa [sic] she stated she
> was 80-90% sure she was picking out the right person.  She went on to say she
> had slight doubt only because there was approximately [a] hundred yards between
> her kitchen window and the front porch of 174 Woodlawn; the residence, which
> was burglarized.  It was a clear sunny day with no adverse conditions.  Theresa
> stated her eyesight is good and she was comfortable in picking out Matthew D.
> Ruble as the man she said at 174 Woodlawn Ave. NW in Perry Township.

ECF No. 33-3 at 9-10.

(5:09CV02173)

### 2.  The Arrest Warrant

After the photo line-up, Escola and England met with Prosecutor Anthony LaPenna to
seek an arrest warrant for Plaintiff.  The officers provided LaPenna with the following evidence:
(1) the statement from Griffin and (2) the statement from Garletts and the photo line-up form.
ECF No. 32 at 37.  Defendant Escola testified that he also verbally informed LaPenna about
Plaintiff's faxed time sheets.  ECF No. 32 at 37.  In response, Esola testified that LaPenna said,
"You've got more than enough to charge him . . . [t]hat's evidence they can bring to court in
their defense."  ECF No. 32 at 37.  LaPenna subsequently authorized the issuance of an arrest
warrant for Plaintiff.

### C.  The Arrest of Plaintiff

Plaintiff was arrested on June 2, 2009 by the local police in accordance with the warrant
issued by LaPenna.  ECF No. 16 at 11.  Escola and England then traveled approximately three
and one-half hours to Ziegler Tire in Monroe, Ohio.[5]  ECF No. 16 at 11.  Upon arrival at Ziegler
Tire, the officers took written statements from plant manager, Gregory Couch, who verified that
Plaintiff was "present at work (Ziegler Tire–Monroe, OH) on the days that he is clocked in on
his personal timecard."  ECF Nos. 36 at 56; 36-51.  Ziegler assistant manager, Eric Harbin, also
provided a written statement explaining that "Matt Ruble was at Ziegler [T]ire in Monroe[,]
Ohio on May 13 Wednesday at 4:02 a.m. till 2:46 p.m.  And I'm saying that I drove him to work

_____

[5]  Plaintiff alleges Escola and England had a "preconceived plan" to go to Cincinnati to
pick up Plaintiff.  ECF No. 44 at 9.  Escola testified they did not know until that morning that
Plaintiff was arrested and that, because they were operating near capacity, the local police could
not hold him.  ECF No. 33 at 17.

(5:09CV02173)

every day since he has started.  And I'm 100% sure that Matt has not missed any day of work on any day."  ECF No. 36-53.

After leaving Ziegler Tire, Escola and England went out to dinner, then met Escola's daughter's family at a local soccer field where Escola's grandchildren were practicing.  ECF No. 43 at 9.  Later in the evening, Escola and England drove to the jail to pick up Plaintiff and drive back to Stark County, Ohio.  ECF No. 43 at 9.  Unbeknownst to Escola and England, a video camera that was installed inside the police cruiser had been turned on before their departure from Perry Township, and the video revealed that on the return trip, Escola and England were "kissing and caressing one another."  ECF Nos. 43 at 9; 33 at 25; 36 at 60.  Upon arrival, Plaintiff was delivered to the county jail.  ECF No. 43 at 10.

The next morning, the officers returned to Stark County Jail to speak with Griffin.  ECF No. 16 at 12.  Griffin recanted his previous statement regarding Plaintiff's involvement in the burglary and wrote a new statement.  ECF Nos. 36-55; 36-56.  Plaintiff was later released and the charges were dropped.  ECF Nos. 16 at 12; 36 at 59.

### D.  Plaintiff's Causes of Action

Based upon these events, Plaintiff asserted the following causes of action:  (1) false arrest claims under 42 U.S.C. § 1983 and state law; (2) malicious prosecution claims under 42 U.S.C. § 1983 and state law; (3) state law claim for false imprisonment; (4) state law claim for abuse of process; (5) state law claim for intentional infliction of emotional distress; (6) state law claim for defamation; (7) state law claim for civil conspiracy; (8) violation of the Fourth, Fifth, and Fourteenth Amendments under 42 U.S.C. § 1983; (9) a claim for deliberate inadequate training,

8

(5:09CV02173)

supervising, and hiring under 42 U.S.C. § 1983; and (10) state law claim for punitive damage.

ECF No. 16 at 12-20. Specifically, Plaintiff alleges that Escola and England were having an

inappropriate relationship during the time they investigated Plaintiff, and that the decision to

arrest Plaintiff was made without probable cause and in furtherance of a "conspir[acy] to falsify

evidence against Matthew Ruble to justify a day long trip together to the Cincinnati, Ohio area."

ECF No. 16 at 7.

Defendants have separately filed motions for summary judgment. ECF Nos. 37, 38, 42.

Defendant Perry Township's motion for summary judgment seeks a ruling solely based upon the

merits. ECF Nos. 51, 37. The § 1983 claims against the officers in their official capacity is the

equivalent of a claim against Perry Township, and is governed by *Monell v. New York City*

*Dep't. of Soc. Servs*, 436 U.S. 658, 691 (1978). *See* *Brown v. Karnes*, Case No. 2:05CV555,

2005 WL 2230206, at *3 (S.D. Ohio Sept. 13, 2005). The officers have moved for summary

judgment based upon the merits of Plaintiff's state and federal claims in their official capacities.

ECF Nos. 38, 42. The officers have also motioned for qualified immunity to the extent the Court

considers any of Plaintiff's allegations against them in an individual capacity as well. ECF Nos.

52, 53. Because the briefings sufficiently indicate proper notice to the officers that they were

being sued in their individual as well as official capacity, we consider the officers' claims of

qualified immunity as to § 1983 claims against them in their individual capacities.[6] *See* *Moore v.*

*City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) ("while it is clearly preferable that plaintiffs

---

[6] The parties addressed qualified immunity issues in their briefings. ECF No. 38 at 11;
42 at 11; 44 at 17-18.

(5:09CV02173)

explicitly state whether a defendant is sued in his or her 'individual capacity,'... failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice.")

## II. Legal Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions, and provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a mater of law . . . .

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex*, 477 U.S. at 317.

Upon review, the Court must view the evidence in light most favorable to the non-moving party to determine whether a genuine issue of material facts exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *see also White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248. Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a

10

(5:09CV02173)

showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Cross-motions for summary judgment are examined under the usual Rule 56 standards.  *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005).  Each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party.  *Appoloni v. U.S.*, 450 F.3d 185, 189 (6th Cir. 2006).

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact.  *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id.*

### III.  Discussion: Constitutional Law Violations

Title 42 U.S.C. § 1983 imposes liability against

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

"[We] engage[ ] in a two-pronged inquiry when considering a municipal-liability claim."

11

(5:09CV02173)

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007)

(quoting *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)).

Courts must first ask whether the plaintiff has asserted the deprivation of a right guaranteed by

the United States Constitution or federal law.  *Powers*, 501 F.3d at 607 (citing *Cash*, 388 F.3d at

542); *see Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003).[7]  Second, courts must analyze

whether the alleged deprivation was caused by the defendants acting under color of state law.[8]

*Powers*, 501 F.3d at 607 (citing *Cash*, 388 F.3d at 542); *Alkire*, 330 F.3d at 813.

A municipality cannot be liable for the constitutional torts of its employees; that is, it

cannot be liable on a *respondeat superior* theory.  *Monell*, 436 U.S. at 691.  Rather, liability will

attach only where the plaintiff establishes that the municipality engaged in a "policy or custom"

that was the "moving force" behind the deprivation of the plaintiff's rights.  *Id.* at 694.

---

[7]  The Court notes the Sixth Circuits interchangeable use of the words "assert[]" and "establish" in the first prong of the two-pronged inquiry when considering a municipal-liability claim.  *See Alkire*, 330 F.3d at 813 ("To state a § 1983 claim, Alkire must establish (a) deprivation of a right secured under the Constitution or federal law; and (b) that deprivation was caused by a person acting under color of state law.").  In accordance with U.S. Supreme Court precedent, the Court requires Plaintiff to "establish" that he was deprived of a right secured by the Constitution or laws of the United States.  *See Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978).

[8]  In order to establish liability under § 1983, the plaintiff must prove that she has been deprived of a federal statutory or constitutional right by someone acting "under color of" state law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  The U.S. Supreme Court held that acts performed by a police officer in his capacity as a police officer, even if illegal or not authorized by state law, are acts taken "under color of" state law.  *Monroe v. Pape*, 365 U.S. 167, 180 (1961).  The record clearly shows that, in this case, the officers acted in their capacity as police officers in the relevant events the lead to Plaintiff's arrest.  ECF No. 16 at 12-20.

12

(5:09CV02173)

### A. Deprivation of a Constitutional Right: False Arrest

Plaintiff argues that Defendants violated a constitutional right based upon the Fourth Amendment when Defendants falsely arrested him, imprisoned him and prosecuted him. ECF No. 16 at 12-13. Plaintiff contends that the Defendants did not have probable cause to obtain a warrant for arrest because the warrant was based upon statements made by an unreliable suspect and a positive ID in a faulty photo line-up. ECF No. 16 at 12-13.

#### 1. Establishing a Claim of False Arrest

##### a. Fourth Amendment Requirements

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. AMEND. IV; *U.S. v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008). "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir.2005); *see also Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir.2009).

When a plaintiff is arrested pursuant to a warrant, the plaintiff must show "that in order to procure the warrant, [the officer] knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause." *Sykes v. Anderson*, 635 F.3d 294, 305 (6th Cir. 2010) (citing *Wilson v. Russo*, 212 F.3d 781, 786-7 (3d Cir. 2000); *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003)).

##### b. Role of the Court

When analyzing a Fourth Amendment claim, "[i]t is the Court's duty to answer whether

13

(5:09CV02173)

the officer's actions were objectively reasonable." *Jones v. Graley*, 2008 WL 343087 *4 (S.D. Ohio Feb. 6, 2008)* (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)* ("At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the non-moving party to the extent supportable by the record . . . the reasonableness of [the officer's] actions . . . is a pure question of law.")); *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008)*.

Employing this guidance, Plaintiff must show that he was arrested without probable cause.  In this case, Plaintiff alleges that there was insufficient probable cause to arrest him because the officers relied upon a warrant that they knew was based upon false or misleading statements that were the product of an improperly conducted photo line-up and unreasonable reliance upon statements made by Griffin.  ECF Nos. 43 at 14-17; 44 at 15-17.

**2.  Defendants Could Not Rely Upon Griffin's Statements**

Defendants argue that their reliance upon Griffin's statements provide a substantial basis for establishing probable cause.  ECF Nos. 38 at 12-13; 42 at 8; 48 at 2-3.  Plaintiff argues that Griffin was unreliable because he lied on several occasions when questioned by the officers and he had a lengthy criminal background.  ECF No. 43 at 5.

A witness' firsthand observations and written statement "are generally entitled to a presumption of reliability and veracity" unless "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he has seen, or was in some fashion mistaken regarding his recollection . . . ." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)* (internal citations and quotations omitted).  In the instant case, Plaintiff has

14

(5:09CV02173)

presented evidence that indicates an apparent reason for the officers to believe that Griffin was lying.

When England initially located Griffin after the burglary, she noted he was "visibly shaking, his hands were shaking uncontrollably and I saw the vain [sic] on his forehead pulsating, indicative of very nervous behavior." ECF No. 43 at 4.  He changed his story twice in that first conversation and ended by crying and saying "I need help, please get me help for my [heroin] habit." ECF No. 43 at 4-5.[9]  In addition to having a reasonable belief that Griffin committed forgery and burglarized a home, a criminal background check revealed Griffin had a long criminal history including charges of criminal damaging or endangering, assault, aggravated burglary, obstructing official business, petty theft and aggravated burglary.  ECF Nos. 36 at 27; 36-15; 36-15.  Escola defined "obstructing official business" as "something to interfere with an investigation" such as misleading police officers.  ECF No. 32 at 29.  When asked whether, as a police officer, Escola would rely upon anything Griffin said, Escola testified in his deposition that he would not, and that is why they continued to investigate.  ECF No. 32 at 25.

Shortly before his arrest, Griffin went to the police station to make a statement, whereby he again implicated Plaintiff in the burglary.  ECF No. 37-2.  Escola and England allege that they further investigated Griffin's statements by "interviewing friends and associates of Plaintiff"

---

[9]  Griffin first claimed he had gone to the credit union to cash a check that a friend had given him in payment for a four-wheeler, then confessed to being a heroin addict and using the money from the check to purchase drugs, then said he had driven Matthew Ruble to the scene of the crime and had stayed in the car while Ruble entered the home and committed the burglary. ECF No. 43 at 4-5.

(5:09CV02173)

regarding Plaintiff's alleged criminal activities. ECF Nos. 32 at 30-31; 36 at 38; 37 at 8. For

reasons even they cannot explain, Escola and England did not document the alleged character

witnesses names or addresses, nor did they take a written statement or include the information in

the police report. ECF Nos. 32 at 31; 36 at 31,36, 38. Escola and England both testified that

they met with four people who allegedly told them that if Griffin had committed a crime with

someone it was likely to have been with Plaintiff. ECF Nos. 32 at 32; 36 at 34. The people

interviewed, however, could not say exactly what Plaintiff had allegedly done in the past or

when he had done it. ECF No. 32 at 33. Defendants had established that Plaintiff did not have a

criminal record other than traffic violations. ECF No. 44 at 5.

    Escola and England continued to investigate. Despite the plant manager at Ziegler Tire

faxing Plainitff's time cards from the day of the burglary indicating Plaintiff was working near

Cincinnati and a note from the manager inviting Escola to call him if he had questions, Escola

did not call the plant manager or anyone else at Ziegler Tire[10]. ECF No.32 at 36. Instead, Escola

---

    [10] Escola asserts he did not call about the time cards because "[a]nybody can stamp anybody's time card." ECF No. 32 at 36. Furthermore, Escola spoke to Ziegler Tire assistant manager Eric Harbon, who verified Plaintiff was present at work on that date. Escolar discounted Harbon's account because he had been told by Harbon's sister (one of the undocumented interviewees) "not to believe Eric Harbon" and that "Eric would cover for [Plaintiff]." ECF Nos. 32 at 36; 43 at 6-7; 44 at 7.
    Failure to "investigate independently every claim of innocence" when executing an arrest warrant is not required by the Constitution. *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (citing *Baker v. McCollan*, 443 U.S. 137, 145-6 (1979) and finding that "to hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.' And if the arresting officer failed to investigate such claims prior to arrest, the arrestee could bring a section 1983 suit."); *See also Marx v. Gumbinner*, 905 F.2d 1503, 1505-07 (11th Cir. 1990) (same); *Romero v. Fay*, 45 F.3d 1472, 1477-8 (10th Cir. 1995) (no need to question plaintiff's alibi witnesses prior to arrest, citing *Criss*, *Marx*, and *Baker*); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996) ("officers not required to conduct a mini-trial before

(5:09CV02173)

and England went back to the jail and asked Griffin to explain the apparent alibi of Plaintiff.

ECF No. 32 at 36.  England asked Escola to interview Griffin because she was not sure she

should believe him.  ECF No. 36 at 40.  Griffin insisted he was telling the truth about Plaintiff.

ECF No. 32 at 36.  Escola, after the interview with Griffin, testified that he told England "[i]t

sounds like he's telling the truth to me" and testified in his deposition, "[b]ut still, just on that in

and of itself is not enough to arrest [Plaintiff] on."  ECF No. 32 at 35.  Defendants clearly knew

that statements from a suspect with a history of obstructing police investigations, buffered by

unsubstantiated and undocumented rumors from some of Plaintiff's associates, is not enough for

probable cause to arrest Plaintiff.  This explains why they continued to investigate Plaintiff.

### 3.  Garletts' Photo Line-Up is Improper

Because of the need for more conclusive information, Escola instructed England to

canvass the neighborhood where the burglary took place for additional witnesses, and during that

time England conducted a photo line-up with Garletts.  ECF No. 32 at 35; 36 at 42.  Plaintiff

claims that the photo line-up positively identifying Plaintiff is not sufficient for probable cause

because England unduly influenced Garletts.  ECF Nos. 43 at 7-9; 44 at 7-9; 45 at 3-4.

According to her deposition, Garletts' account of England's photo line-up assessment is

as follows:

[England] asked if she could speak to me about what happened, and I said sure.  I

_____

arresting"), cert. denied, 519 U.S. 867 (1996).
        Furthermore, the record reflects that England, with the approval of Escola, was
improperly documenting her time cards so as to reflect she had not worked over her 39 hour a
week limit.  ECF No. 33 at 22.  Given his lackadaisical attitude towards the time cards, it is not
surprising that Escola prejudged it unprofitable to check Plaintiff's time cards.

(5:09CV02173)

> invited her in.  We stood in my kitchen and she had–she wanted me to tell her
> again about the description of the man.  And she said–asked me, if I could, from a
> lineup of six men, if I could pick out one.  I told her I didn't see his face.  I told
> her I couldn't be positive about a positive ID.  She said, 'If you had to pick one,
> which one would it be?'  So by process of elimination, according to size, weight,
> it was only–the pictures were only from the chest up, I think, I just eliminated the
> first three men that seemed too big.  And then the last–pretty much it came down
> to the last two.  And I told her, 'I just can't pick between these two.  I didn't see
> him.  I didn't see his face.'  And she's, like, 'Well, which one would you say you
> most likely feel it would be?'  So I pointed to one individual and she said–I said,
> 'I don't know.'  And she said, 'You're right on target.'  I remember her saying
> that.

ECF No. 34 at 5.  Garletts communicated to England that she "was doubtful for several reasons:

I couldn't see his face, it was far away and there was a tree in the way."  ECF No. 34 at 6.

Despite Garletts' doubt, she testified that England instructed Garletts to "put down a percentage

as to how sure you are."  ECF No. 34 at 14.  Garletts wrote, "I would have to say I'm about 80 to

90 percent sure [that] this is the person I saw."  ECF Nos. 34 at 14; 36-35.

When England completed her narrative report, she wrote that Garletts identified the

Plaintiff "[w]ithin the first five seconds."  ECF No. 33-3 at 9.  Garletts disputes this (ECF No. 34

at 6) and so, apparently, does England.[11]  ECF No. 36 at 46.

Furthermore, England "forgot" the form that the witness must read and sign before

---

[11]  In deposition, England was asked,

> Q:    And it's your indication that when you showed her the photo lineup, within five
>        seconds she immediately pointed to Matthew Ruble?
> A:    No.  She ran – this is the lineup.  She had the pen I gave her and she ran her finger
>        or the pen over it and she said, "that looks like him."

ECF No. 36 at 45-6.  It is not clear, then, why England wrote in her narrative that "[w]ithin the
first five seconds Theresa picked out Matthew Ruble..." or what part of the deposition questions
she was answering "no" to.  ECF No. 33-3 at 9.

18

(5:09CV02173)

looking at the photographs. ECF No. 36 at 46. This paragraph is the paragraph that directs

witnesses in capital letters: "YOU MUST BE 100% POSITIVE." ECF No. 37-2. Instead,

England testified she told Garletts to read the back of the form England had brought. ECF No.

36 at 46. England did not read it to Garletts, and Garletts testified she did not read it. ECF No.

34 at 6.[12] Furthermore, England testified that Garletts did not circle number 6 after choosing

number 6, and England left Garletts' house without having Garletts circle number 6 or otherwise

documenting number 6 as Garletts' selection. ECF No. 36 at 46. Later, England had another

officer go back to Garletts' house to have Garletts circle number 6. ECF No. 36 at 46.

The Garletts photo ID line-up, at best, did not follow proper procedure and, at worst,

resulted in England influencing the witness' selection. Defendants make much of the fact that

Garletts chose Plaintiff, presumably to assert there was probable cause to arrest him based upon

the ID. However, the fact that Garletts chose Plaintiff, whom no one is alleging was at the house

that day, would seem to have the opposite effect of illustrating how a witness in a mishandled

photo ID line-up can be influenced to chose a particular suspect. The fact Garletts chose

Plaintiff, and did so amid the forgotten form, the unread instructions, Garletts' expressed doubts

about her ability to do so and England's alleged influence, would indicate that if the photo line-

---

[12] The paragraph on the back of the form reads:

You will be asked to look at a group of photographs. The fact that the photographs are
shown to you should not influence your judgement [sic]. You should not conclude or
guess that the photographs contain the picture of the person who committed the crime.
You are not obligated to identify anyone. It is just as important to free innocent persons
from suspicion as to identify guilty parties. Please do not discuss the case with other
witnesses nor indicate in any way that you have identified someone.

ECF No. 37-2.

(5:09CV02173)

up were improper and unduly suggestive as Plaintiff alleges, it did not constitute probable cause.

### 4.  The Warrant Was Not Valid

Defendants argue that a facially valid warrant is a defense to false arrest.  ECF No. 42 at 12.  However, when a warrant is issued based upon false or misleading statements or material omissions made by a police officer applying for the warrant, this defense is not available to the officers.  Sykes, 635 F.3d at 305.  The officers basis for probable cause is two-fold:  (1) Griffin's statement and (2) Garletts' photo line-up identification and statement.  ECF No. 32 at 37.  Upon finding that the officers could not rely solely upon Griffin's statement, the balance of the basis for probable cause to arrest is Garletts' photo line-up determination.

### a.  England Violated Plaintiff's Constitutional Right

The conflicting testimony of England and Garletts presents several genuine issues of material fact, including at a minimum:  (1) whether Garletts' had an obstructed view;[13] (2) whether Garletts had difficulty in selecting a photograph;[14] (3) whether England influenced Garletts;[15] and, (4) whether England properly instructed Garletts before conducting the photo

---

[13]  Garletts explained to England that she did not see the male's face and further explained that she wears "glasses for distance" and the "huge tree in the front yard" blocked her entire view of the male's head.  ECF No. 34 at 5.  England's narrative explains that "[i]t was a clear sunny day with no adverse conditions [and] Theresa stated her eyesight is good . . . ."  ECF No. 33-3 at 9-10.  Garletts testified she did not say her eyesight is good, that she wears glasses for distance, and did not have them on at the time.  ECF No. 34 at 6.

[14]  Garletts communicated to England that she "was doubtful for several reasons:  I couldn't see his face, it was far away and there was a tree in the way."  ECF No.  34 at 6.  In contrast, England testified that Garletts "absolutely" did not indicate that she had difficulty making the selection.  ECF No. 36 at 45.

[15]  Garletts testified that she felt influenced during the photo line-up.  ECF No. 34 at 5.

20

(5:09CV02173)

line-up.[16]  Given the discrepancies over what occurred and what appeared in England's narrative

report, if Garletts' testimony is true, England knowingly or recklessly provided false or

misleading statements that were material to procure a warrant for Plaintiff's arrest.  As noted

above, Griffin's statements alone did not provide independent probable cause; therefore,

England did not have sufficient independent probable cause to arrest Plaintiff and may not rely

upon the warrant procured with allegedly false information.  *See, e.g., Jenkins v. City of New

York*, 478 F.3d 76, 93 (2d Cir. 2007) (finding, in a § 1983 context, a photo line-up witness

testifying that the officers "were, like, you had to pick somebody..."rendered the photo line-up so

defective that it negated probable cause).

### b.  Escola Did Not Violate Plaintiff's Constitutional Right

Escola was not present during Garletts' photo ID, and Plaintiff has not presented

evidence that Escola knew of the alleged wrongdoing by England.   England's narrative report

reads that Garletts chose Plaintiff within the first five seconds, and there is nothing on the face of

---

[16]  According to Garletts' testimony, England did not share with her the information set-
forth in the photo line-up ID form:

    Q:     Okay.  Did she, at any point, share with you any information that's set
          forth in this exhibit that says in the second–actually, the third sentence, it
          says 'You should not conclude or guess that the photographs contain the
          picture of the person who committed the crime'?  Did she ever share that
          with you?
    A:     No.
    Q:     Likewise, did Officer England ever share with you information, or this
          information, 'You are not obligated to identify anyone'?
    A:     She didn't give me that option really.
    Q:     What option did she give you?
    A:     She said, 'If you had to pick one, which one would it be?'

ECF No. 34 at 6-7.

(5:09CV02173)

that report to indicate improprieties.  The written statement by Garletts that Garletts was "80-90% sure" does not in-and-of itself negate probable cause.  The prosecutor, having all the information Escola had about the photo ID, determined probable cause existed.[17]  ECF No. 43 at 9.  Plaintiff cannot show that Escola knowingly or with a reckless disregard for the truth procured a warrant for Plaintiff's arrest or knew the warrant was based upon allegedly false information or a material omission.  Escola had a good faith basis for relying upon the warrant, and, thus, Escola is entitled to qualified immunity for the individual claim of false arrest.  *See U.S. v. Leon*, 468 U.S. 897, 923 (1984); *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998).

### 5.  The Constitutional Right Was Clearly Established

It has long been settled law that arresting a person without probable cause is unconstitutional.  U.S. CONST. AMEND. IV; *Sykes*, 625 F.3d at 305.  Falsifying facts to establish probable cause to arrest is unconstitutional.  *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); *Donta v. Hooper*, 774 F.2d 716, 718 (6th Cir. 1985); *Franks v. Delaware*, 438 U.S. 154, 168 (1978).  Relying upon a warrant obtained by false or misleading statements is unconstitutional.  *Sykes*, 625 F.3d at 305.  Conducting an unduly suggestive line-up that results in a seizure without probable cause is unconstitutional.  *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993)(finding that while alleging an improper line-up without more is not a constitutional violation, there would be

---

[17]  The record reflects Esocla told Prosecutor LaPenna about the Plaintiff's time cards and that Escola had not called to confirmed them.  ECF No. 32 at 37.  Escola also pointed out Garletts was only 80-90% sure, but felt comfortable picking out Plaintiff and did so within five seconds.  ECF No. 32 at 38.

(5:09CV02173)

a constitutional violation if the line-up was unduly suggestive and caused a violation of a known

right).

### B.  Deprivation of a Constitutional Right:  Malicious Prosecution

Plaintiff argues that Defendants violated a constitutional right based upon the Fourth

Amendment when Escola and England maliciously prosecuted him.  ECF No. 16 at 14.

### 1.  Establishing a Claim of Malicious Prosecution

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious

prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation,

prosecution, conviction, and incarceration.'"  *Sykes*, 625 F.3d at 308 (quoting *Barnes v. Wright*,

449 F.3d 709, 715-16 (6th Cir. 2006)).  Malicious prosecution is "entirely distinct" from false

arrest, in that a malicious prosecution tort remedies detention accompanied by wrongful

institution of the legal process.  *Wallace v. Kato*, 549 U.S. 384, 390 (2007).

In order to survive a motion for summary judgment against a malicious prosecution claim

pursuant to § 1983, a plaintiff must present a genuine issue of material fact as to the following:

> First, the plaintiff must show that a criminal prosecution was initiated
> against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d]
> in the decision to prosecute.  Second, because a § 1983 claim is premised on the
> violation of a constitutional right, the plaintiff must show that there was a lack of
> probable cause for the criminal prosecution.  Third, the plaintiff must show that,
> as a consequence of a legal proceeding, the plaintiff suffered a deprivation of
> liberty, as understood in our Fourth Amendment jurisprudence, apart from the
> initial seizure.  Fourth, the criminal proceeding must have been resolved in the
> plaintiff's favor.

*Sykes*, 625 F.3d at 308-9 (citations omitted) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir.

2007); *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)).

(5:09CV02173)

### 2. Probable Cause for the Criminal Prosecution

Plaintiff argues Defendants lacked probable cause for the prosecution of Plaintiff because, as in the false arrest context, the arrest warrant was obtained absent probable cause. ECF No. 16 at 14. Defendants argue that they did not participate in the prosecution of Plaintiff, and that, alternatively, there was sufficient probable cause to prosecute Plaintiff. ECF Nos. 38 at 11-14; 42 at 14.

The constitutional torts of malicious prosecution and false arrest are independent torts based upon the Fourth Amendment. *Thacker v. City of Columbus*, 328 F.3d 244, 258-59 (6th Cir. 2003) (finding that, at a minimum, a plaintiff must show "that there was no probable cause to justify [his] arrest and prosecution.")(citing *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001)). Nonetheless, Plaintiff's malicious prosecution allegation stems from his false arrest and imprisonment claim. ECF No. 44 at 19 ("The false arrest/ false imprisonment/ malicious prosecution causes all rest upon whether there was probable cause for Matthew Ruble's arrest."). The morning after Plaintiff was arrested, he was released because Griffin recanted his previous statement. ECF No. 44 at 10. Defendants dropped the initial charges against Plaintiff, despite the prosecutor assuring them they still had enough to keep and prosecute Plaintiff. ECF No. 44 at 10; 47 at 8. Plaintiff points to no evidence that shows Defendants continued to prosecute Plaintiff after his detention– in fact, they released him. As such, Plaintiff fails to state a claim of malicious prosecution, and England and Escola are entitled to qualified immunity.

24

(5:09CV02173)

### D.  Perry Township's Policy or Custom

Once a plaintiff has asserted a constitutional deprivation, liability under § 1983 will only attach to a municipality if the municipal policy or custom proximately caused the constitutional deprivation.  *Monell*, 436 U.S. at 691; *Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v.Cnty of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008).  According to Supreme Court decisional law, municipal liability may be based upon:  (1) an express municipal policy, such as a ordinance, regulation, or police statement, *see Monell*, 436 U.S. at 660-61; (2) a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *see City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) (internal quotation omitted); or (3) the decision of a person with "final policy making authority," *see Praprotnick*, 485 U.S. at 123; *see also Pembaur*, 475 U.S. at 481-83.  The following types of municipal polices and practices may give rise to § 1983 liability:

(1)     Deliberately indifferent training, *City of Canton v. Harris*, 489 U.S. 378, 380 (1989);

(2)     Deliberately indifferent supervision or disciple, *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *see Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1990);

(3)     Deliberately indifferent hiring, *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997); and

(4)     Deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *see Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).

Turning to the instant matter, Plaintiff alleges that Perry Township is liable based upon

25

(5:09CV02173)

the decision of a person with final policy making authority–Defendant Escola–for the deliberate

indifference of training and supervising the officers and hiring England.  ECF No. 16 at 4; 7-8;

17; 18-19.

Plaintiff argues that Escola was acting as the decision maker with final authority on

policy matters relevant to the operations of the Perry Township Police Department, including:

> [T]he power to control investigations conducted by the police department; the
> power to limit or expand the course and scope of an investigation; the power to
> end an investigation when the evidence clearly did not support a suspect's guilt;
> the power to control the conduction of photo line-ups; the power to order the
> arrest of individuals including Plaintiff Matthew Ruble; the power to decide when
> and how to arrest suspects, including Plaintiff Matthew Ruble; the power to
> decide the means by which officers, including Defendant Escola and Defendant
> England, were assigned to work on cases; and the power to assign officers,
> including Defendant Escola and Defendant England, to pick up suspects held by
> other police departments.

ECF Nos. 16 at 17.

### 1. "Official Policy" Requirement

Whether an official has final policymaking authority is an issue of law to be determined

by the court by reference to state and local law.  *Jett v. Dallas Indep. School Dist*., 491 U.S. 701,

737 (1989).  The Supreme Court held that a municipality can be liable under § 1983 for a single

decision by the municipality's policymakers.  *Pembaur*, 475 U.S. at 479-80.  An official's mere

authority to exercise discretion while performing particular functions does not make that official

a final policymaker "unless the official's decisions are final and unreviewable and are not

constrained by the official policies of superior officials."  *Feliciano v. City of Cleveland*, 988

F.2d 649, 655 (6th Cir. 1993) (citing *Praprotnik*, 485 U.S. at 127).  To determine whether final

26

(5:09CV02173)

authority to make municipal policy is vested in a particular official, we must resort to state law.[18]

*Pembaur*, 475 U.S. at 483; *Jett.*, 491 U.S. at 737.  This includes "state and local positive law," such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom.  *Jett*, 491 U.S. at 737.

### a.  Ohio Revised Code

The applicable Ohio law, R.C. § 737.06, states:  "The chief of police shall have exclusive control of the stationing and transfer of all patrolmen, auxiliary police officers, and other officers and employees in the police department, and police auxiliary unit, under such general rules and regulations as the director of public safety prescribes."  The applicable Ohio law reveals that the chief of police is subordinate to the director of public safety.  Plaintiff offers no regulations or written procedures that indicate otherwise.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (finding that the City Charter of Cleveland and the Cleveland Code § 135.09(a), the applicable Ohio law, revealed that the "Chief of Police is subordinate to the Director of Public Safety[,]" and therefore, "plaintiffs have not shown that the Chief of Police has been delegated the authority to make final policy regarding drug testing through Ohio positive law").  The analysis does not stop here, for the Court must now consider Ohio procedure and custom.  *Feliciano*, 988 F.2d at 655 (citing *Jett*, 491 U.S. at 737); *Pembaur*, 475 U.S. at 481, n. 10.

### b.  Local Practice and Custom

The Supreme Court has long recognized that a "custom" is a widespread practice that,

---

[18]  The Supreme Court noted that "municipalities often spread policymaking authority among various officers and official bodies."  *Pembaur*, 475 U.S. at 483.

(5:09CV02173)

although not authorized by written law, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Monell*, 436 U.S. at 691.

Perry Township argues that the facts merely demonstrate that Escola has the discretionary authority to act.  ECF No. 37 at 13; *Praprotnik*, 485 U.S. at 126 ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").

Generally, identifying a policymaking official is a question of law for the court to decide, not one of fact to be submitted to a jury; however, the existence of a local practice or custom, normally presents an issue of fact for the jury.  *Praprotnik*, 485 U.S. at 124; *Worsham v. City of Pasadena*, 881 F.2d 1336, 1344 (5th Cir. 1989).  In the matter before the Court, Plaintiff raises a genuine issue of material fact through Escola's deposition testimony.  Escola testified that he had the power and control to order police investigations, conduct photo line-ups, and arrest suspects. ECF No. 32 at 5.  Escola also testified that his responsibility to oversee the operation of the police department included duties "regarding policies and procedures."  ECF No. 32 at 5.  In accordance with Escola's testimony, Plaintiff argues that Escola's authority to seek an arrest warrant for a suspect is without any oversight from Perry Township, and thus more than discretionary.[19]  ECF No. 45 at 10.  Plaintiff, through use of Escola's testimony, has challenged

---

[19]  Escola's testimony as to unconstrained decision making authority is as follows:

Q: Right.  I understand.  But, for example, if you decide you're going to arrest someone, you don't have to go to the Trustees to get their approval?

A: No, I do not.

28

(5:09CV02173)

Perry Township's argument that Escola has discretionary authority to act, thereby setting forth facts showing the existence of a genuine issue–whether Escola had final policymaking authority. *See* *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court will now turn to Plaintiff's allegations that Perry Township's policies give rise to § 1983 liability.

### 2.  The Policy:  Inadequate Training

In *City of Canton v. Harris*, the Supreme Court held that deliberately indifferent training may give rise to a § 1983 municipal liability. 489 U.S. 378 (1989). The Court found that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* at 387. The Court held that a § 1983 municipal liability may be based upon inadequate training "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact[,]" and that deliberate indifference was the moving force of the violation of the plaintiff's constitutional right. *Id.* at 387. The plaintiff must demonstrate specific training deficiencies and either: (1) a pattern of constitutional violations in which policymaking officials can be charged with knowledge, or (2) that training is obviously necessary to avoid constitutional violations.[20] *Id.* at

----

ECF No. 32 at 5.

[20] The Court explained:

[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

29

(5:09CV02173)

390.  The plaintiff must show that "the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights[,]" as to amount to a municipal policy of deliberate indifference to citizens' constitutional rights.  *Id*.  The *Canton* Court held that negligent training does not by itself give rise to a § 1983 municipal liability claim.  *Id*. at 390-91.  The plaintiff must also show a sufficiently close causal connection between the deliberately indifferent training and the deprivation of the plaintiff's constitutional right.  *Id*.

Defendant Perry Township argues that Plaintiff's claim of inadequate training is merely an allegation of "negligence."  ECF No. 37 at 18.  Perry Township further asserts that there is no evidence that it was indifferent to Plaintiff's constitutional rights, that the officers had a history or policy of making unlawful arrests, or that Perry Township was aware of such issues.  ECF No. 37 at 18.

In response, Plaintiff argues that "Escola had never trained England on photo lineups [and] Escola was [] the individual that Perry Township had entrusted with assigning police officers to tasks and investigations."  ECF No. 45 at 17.  Given this backdrop, Plaintiff avers that a "reasonable jury could easily conclude that Escola, the Chief and Township official delegated with training, knew that England was grossly incompetent to conduct a photo lineup."  ECF No. 45 at 17.

In reply, Perry Township argues that Plaintiff's entire claim is based upon a single photo

---

*Canton*, 489 U.S. at 390 (internal footnotes omitted).

(5:09CV02173)

line-up that does not rise to the level of deliberate indifference on the part of Escola or Perry Township.  ECF No. 46 at 7.  Perry Township explains that England had prior experience with photo line-ups including the bank teller in the instant case, wherein Julia LeFever identified Griffin as the man who cashed the stolen checks.  ECF Nos. 46 at 7; 32 at 19, 20-21.  Escola conducted the line-up though England was present and Escola had England sign the forms.  ECF No. 37-2 at 8-9.  Plaintiff points out that "England's narrative report discusses the care that Escola took to ensure that the lineup was conducted appropriately.  Escola 'clearly instructed [the teller] to look through the pictures and take her time in doing so.'"  ECF No. 44 at 4.  For all intents and purposes, it appears as though Escola properly ran a line-up in such a way that was intended to train England and did have that result given England's narrative report of the appropriate steps taken by Escola.  ECF No. 36-5.

Perry Township likewise emphasizes that there is no allegation that this first line-up was flawed.  ECF No. 46 at 8.  Perry Township concludes that given Escola's own experience with England performing a photo identification line-up, as well as England's prior experience with the Montville Police Department and Medina County Sherif's Department, it cannot be deduced that Chief Escola or Perry Township acted with deliberate indifference.  ECF No. 46 at 8.

The *Canton* Court ruled that a plaintiff must identify a particular deficiency in the training program and prove that the identified deficiency was the cause of the plaintiff's constitutional injury.  *Canton*, 498 U.S. at 390-91.  The Court finds that Plaintiff merely alleged that England was inadequately trained and that the conduct resulting in his injury could have been avoided by more or better training.  ECF No. 45.  The *Canton* Court is clear that a plaintiff

(5:09CV02173)

will not prevail on such a theory.  *Canton*, 498 U.S. at 390-91.

Plaintiff also failed to demonstrate municipal liability by way of a pattern of unconstitutional conduct–the alternative approach to showing deliberate inadequate training–because Plaintiff only identified a single photo line-up opposed to a pattern of improper photo line-ups.  In accordance with the notion that federal courts are not to become involved "in an endless exercise of second-guessing municipal employee-training programs," the Court finds that Plaintiff's allegations do not satisfy the stringent standards for fault (*i.e.*, deliberate indifference) and causation (*i.e.*, moving force) and thus fail as a matter of law.  The Court, therefore, grants summary judgment as to inadequate training in favor of Defendants.

### 3.  The Policy:  Inadequate Supervision

In *Gregory v. City of Louisville*, the Sixth Circuit held that "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act."  444 F.3d 725, 751 (6th Cir. 2006) (internal citations and quotations omitted).  The *Gregory* Court explained that "the supervisors must have actively engaged in unconstitutional behavior [and] liability must lie upon more than a mere right to control employees and cannot rely on simple negligence."  *Id*.  Stated differently,

> [A] failure of a supervisory official to supervise, control or train the offending individual[s] is not actionable absent a showing that the official either encouraged or in some way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees.]

*Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1990).  In order to sustain his claim, Plaintiff must introduce evidence that Escola "implicitly authorized, approved or

32

(5:09CV02173)

acquiesced" in the alleged unconstitutional conduct.

In an effort to satisfy this requirement, Plaintiff alleges that "Chief Escola knew that England had worked for the department for less than two months, and yet he was the one who instructed her to return to conduct the photo lineup."[21]  ECF No. 45 at 17.  Plaintiff's claim is misplaced because the standard is not whether Escola implicitly authorized, approved or knowingly acquiesced a photo line-up conducted by England, but rather whether Escola implicitly authorized, approved or knowingly acquiesced unconstitutional behavior.  Escola's reliance on the photo line-up to establish probable cause does not equate to implicitly authorizing, approving or knowingly acquiescing unconstitutional conduct because Escola testified and believed that England understood the proper procedure to conduct a photo line-up and there was nothing on the face of the report of that line-up to indicate otherwise.  ECF Nos. 38 at 4; 32 at 20-21.  Plaintiff's claim, at best, amounts to mere negligence instead of active engagement in unconstitutional behavior.  As a matter of law, the Court, therefore, grants summary judgment as to inadequate supervision in favor of Defendants.

### 4.  The Policy:  Inadequate Hiring

In *Board of County Commissioners v. Brown*, the Supreme Court held that municipal

---

[21]  In the interest of thoroughness, the Court notes both Escola and England testified under oath that Escola did not "instruct [England] to return to conduct the photo lineup."  ECF No. 45 at 17.  Rather, both Defendants testified that Escola instructed England to "canvas the neighborhood" in order to ascertain whether there were witnesses that the initial canvassing had failed to uncover.  ECF Nos. 32 at 35; 36 at 42-3.  The photo line-up was England's idea but was nevertheless proper procedure for an officer canvassing an area and finding a witness that had seen the suspect.  ECF Nos. 32 at 36; 36 at 42-3.  Plaintiff has not alleged that is it improper procedure for an officer canvassing an area to conduct a photo line-up after having located a witness that saw the suspect.

(5:09CV02173)

liability can be premised upon a municipality's deliberately indifferent hiring of a constitutional wrongdoer, but only if the plaintiff demonstrates that the hired officer "was highly likely to inflict the *particular* injury suffered by the plaintiff." 520 U.S. 397, 412 (1997) (emphasis in original). In order to "prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."[22] *Id.* at 410.

Plaintiff's claim against Perry Township regarding how England was hired fails as a matter of law because Plaintiff has failed to demonstrate that Escola's decision to hire England reflects a conscious disregard for a high risk that England would conduct an improper photo line-up to establish probable cause in violation of Plaintiff's constitutional right. Without elaboration, Plaintiff alleges that Escola "was the only person to interview England before she was hired by Perry Township." ECF No. 45 at 16. In accordance with the rigorous requirements of culpability and causation, the Court finds that Plaintiff has not proffered any evidence demonstrating that England "was highly likely to inflict the *particular* injury suffered" and, therefore, grants summary judgment as to inadequate hiring in favor of Defendants.[23] *See Brown*, 520 U.S. at 405, 412.

Summary judgment in favor of Defendants is appropriate as to Plaintiff's § 1983 *Monell* claims because even if a constitutional violation and final policymaking authority is assumed,

---

[22] In *Brown*, the Court distinguished Brown's claim, involving a single lawful hiring decision that ultimately resulted in a constitutional violation, from a claim that "a particular municipal action *itself* violates federal law, or directs an employee to do so." 520 U.S. at 405.

[23] Plaintiff further fails to provide any evidence to the contrary that England had in fact come highly recommended from her previous employers. ECF No. 32 at 9, 10-1.

(5:09CV02173)

Plaintiff did not produce evidence of an unconstitutional policy or custom that would support §

1983 liability.  *See Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008)

("[C]onclusory statements are not sufficient to survive any motion for summary judgment, much

less to allow a municipality to be held liable for the acts of its employees.").

### IV.  Discussion:  State Law Violations

Plaintiff alleges a number of state law claims against Defendants stemming from the

alleged conduct described above.  "A federal court exercising supplemental jurisdiction over

state law claims [under 28 U.S.C. § 1367] is bound to apply the law of the forum state to the

same extent as if it were exercising its diversity jurisdiction."  *Super Sulky, Inc., v. U.S. Trotting*

*Ass'n.*, 174 F.3d 733, 741 (6th Cir.1999); *Chandler v. Speciality Tires of America (Tennessee),*

*Inc.*, 283 F.3d 818, 823 (6th Cir.2002).  The federal court is to "apply state law in accordance

with the controlling decisions of the state supreme court."  *Moore v. Detroit School Reform Bd.,*

293 F.3d 352, 359 (6th Cir.2002).  When the state's highest court has not decided the issue, the

federal court must ascertain the state law from "all relevant data."  *Garden City Osteopathic*

*Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. V. & O Press Co.*, 770

F.2d 601, 604 (6th Cir.1985)).  All relevant data includes the state's intermediate court decisions,

restatements of law, law review commentaries and decisions from other jurisdictions on the

"majority" rule.  *Rousey v. U.S.*, 115 F.3d 394, 397 (6th Cir. 1997).

### A.  State Immunity

Plaintiff alleges Escola and England intentionally falsified evidence in order to procure a

warrant with which to arrest Plaintiff, and this led the officers to commit several tortious acts

(5:09CV02173)

against Plaintiff.  ECF No. 16 at 12-3.  Escola and England argue they are immune from suit

based upon state law immunity.  ECF Nos. 38 at 14; 42 at 17.

Ohio Revised Code Chapter 2744 creates a presumption that political subdivisions and

their law enforcement officers are immune from liability from state tort claims.  *Cook v.*

*Cincinnati*, 658 N.E.2d 814, 820 (Ohio Ct. App. 1995).  The question of whether a governmental

employee or political subdivision is entitled to statutory immunity is again a question of law for

a court's determination.  *Feitshans v. Darke County*, 686 N.E.2d 536, 539 (Ohio Ct. App. 1996).

R.C. 2744.03(A)(6) governs a political subdivision employee's immunity.  *Smith v.*

*Redecker*, 2010 WL 541355, *8 (Ohio App. Ct. Feb. 4, 2010).  Pursuant to R.C. 2744.03(A)(6), a

political subdivision employee is immune from liability for acts or omissions in connection with

a governmental or proprietary function unless one of three exceptions applies: (1) his acts or

omissions are manifestly outside the scope of his employment; (2) his acts or omissions are

malicious, in bad faith, or wanton or reckless; or (3) liability is expressly imposed upon the

employee by another section of the Revised Code.  *Id.*  Thus, an employee of a political

subdivision is presumed immune unless one of these exceptions to immunity is established.  *See*

*Cook,* 658 N.E.2d at 820.

Plaintiff does not argue that the officer's acts were manifestly outside the scope of their

employment or official responsibilities.  Additionally, Plaintiff does not allege that liability is

expressly imposed by a statute.  Any review thus focuses on R.C. 2744.03(A)(6)(b), whether the

officers' acts "were with malicious purpose, in bad faith, or in a wanton or reckless manner."

The term "malice" means the willful and intentional desire to harm another, usually

36

(5:09CV02173)

seriously, through conduct which is unlawful or unjustified.  *Hicks v. Leffler*, 695 N.E.2d 777, 780 (Ohio Ct. App. 1997).  "Bad faith" implies a sinister motive that has "no reasonable justification."  *Id.*  "Bad faith" embraces more than bad judgment or negligence, it imports a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.  It also embraces actual intent to mislead or deceive another."  *Id.*; *See also Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 602 N.E.2d 363, 367 (Ohio Ct. App. 1991).

Wanton misconduct has been defined as the failure to exercise any care whatsoever.  *See Fabrey*, 639 N.E.2d at 35 (citing *Hawkins v. Ivy*, 363 N.E.2d 367, syllabus (Ohio 1977)).  The Ohio Supreme Court has held that "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."  *Fabrey*, 639 N.E.2d at 35 (quoting *Roszman v. Sammett*, 269 N.E.2d 420, 422 (Ohio 1971)).  Such perversity requires that the actor be conscious that his conduct will, in all likelihood, result in an injury, and the standard of proof to show wanton misconduct is high.  *Id.*

"Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make [an actor's] conduct negligent."  *Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990).  Likewise, an individual acts recklessly when he or she, bound by a duty, does an act or intentionally fails to do an act, knowing, or having reason to know of facts that would lead a reasonable person to realize not only that there is an unreasonable risk of harm to another, but also that such risk is substantially greater than that which is necessary for negligence.  *See Id.*; *Fabrey*, 639 N.E.2d at 35.

(5:09CV02173)

### B. False Arrest/ False Imprisonment

Plaintiff argues he was falsely arrested and imprisoned by Escola and England because they fabricated evidence to establish probable cause in order to procure a warrant for his arrest. ECF No. 16 at 12-3.

"In its essential elements, a claim for false arrest is indistinguishable from a claim for false imprisonment in that each claim requires proof that one was intentionally confined within a limited area, for any appreciable time, against his will and without lawful justification." *Evans v. Smith*, 646 N.E.2d 217, 224 (Ohio Ct. App. 1994) (citing *Feliciano v. Kreiger*, 362 N.E.2d 646 (Ohio 1977)). In false arrest, the action is based upon "some asserted legal authority to enforce the law (such as that possessed by a police officer), whereas the tort of false imprisonment is reserved for those situations in which detention is purely a matter between private persons." *Norwell v. Cincinnati*, 729 N.E. 2d 1223 (Ohio Ct. App. 1999) (citing *Evans*, 646 N.E.2d at 224). Because the instant action is a matter between a private person and a police officer, the correct tort is false arrest. As such, the Court treats Plaintiff's two claims of false arrest and false imprisonment as one claim of false arrest.

In Ohio, a claim for false arrest requires proof of (1) a detention of the person, and (2) an unlawful detention. *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003). Like false arrest claims pursuant to Fourth Amendment standards, "under Ohio law, an arrest warrant, 'issued by a court unless utterly void is a complete defense to an action for false arrest or false imprisonment.'" *Voyticky*, 412 F.3d at 677 (quoting *McFarland v. Shirkey*, 151 N.E.2d 797, 802 (Ohio Ct. App.1958)). To preclude state immunity, a plaintiff must further show the warrant was

38

(5:09CV02173)

void because the officer made a false statement either intentionally or with a reckless disregard

for the truth.  *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994).

 As already noted above, the record does not reflect that Escola made a false statement

intentionally or with a reckless disregard for the truth when procuring the warrant.  Thus, Escola

is immune pursuant to R.C. 2744.03(A)(6).  A genuine issue of material fact exists as to whether

England made a false statement intentionally or with a reckless disregard for the truth.  The

record reflects England knew the importance of a properly conducted photo ID lineup[24], and her

alleged conduct, if found to be true, would rise to the level of wanton or reckless.  Thus, England

is not entitled to state immunity, and her motion for summary judgment as to the false arrest

claim is denied.  Summary judgment, as applicable, is granted to the remaining defendants on

this claim.

### C. Malicious Prosecution

 The Ohio Supreme Court has recognized that an action for malicious prosecution is

---

[24] England testified:
Q:      What is the importance of a photo lineup?
A:      the importance?
Q:      Yeah.
A:      It is very important.
Q:      Why is it important?  For whose sake is it important?
A:      For both sides.
Q:      What side?
A:      For, in this case, Theresa Garletts.
Q:      Right.
A:      Because she needs to be telling the truth for Matt Ruble and for me.
Q:      And why is it important for Matthew Ruble?
A:      Because he's the person who is in the lineup.
ECF No. 36 at 44.

(5:09CV02173)

"closely akin" to an action for false arrest or false imprisonment, but has characterized "the distinction between them [as] fundamental." *Rogers v. Barbera*, 164 N.E.2d 162, 164 (Ohio 1960). "A suit for false arrest or false imprisonment is the proper action where the aggrieved party is arrested without legal process, or under a void process; but where the process on which the arrest is made is regular on its face, but is sued out maliciously and without probable cause, the remedy is an action for malicious prosecution.'" *Id.* (quoting 22 American Jurisprudence 353, False Imprisonment, at Sections 2 and 3 (1939)); *see also Brothers v. County of Summit*, 2007 WL 1567662 (N.D. Ohio May 25, 2007).

Because Plaintiff was arrested pursuant to a void legal process, the proper claim is false arrest. *See Durbin v. Ohio State Highway Patrol*, 615 N.E.2d 694, 697 (Ohio Ct. App. 1992) (noting the plaintiff's malicious prosecution claim constituted false arrest because he alleged the warrant issued was void for lack of probable cause). Thus, the malicious prosecution claim is without merit. Summary judgment, as applicable, is granted on this claim.

### D. Abuse Of Process

Plaintiff alleges a state law claim of abuse of process. ECF No. 16 at 15. An abuse of process claim requires: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. *Yaklevich v. Kemp, Schaeffer and Rowe, Company, L.P.A.*, 626 N.E.2d 115, 118 (Ohio 1994).

Because the Court has established England did not have probable cause to arrest Plaintiff,

(5:09CV02173)

a claim against her cannot lie.  As for Escola, Plaintiff cannot show facts that indicate he

perverted the proceeding to accomplish an ulterior purpose.  Though Plaintiff makes much of the

personal relationship between Escola and England, the facts do not show this alleged relationship

caused Escola to pervert the investigation so as to leave town with England.  ECF No. 44 at 19.

Rather, the facts show Escola was reasonable in his reliance upon Garletts' photo ID and the

prosecutor's issuance of the arrest warrant.  England and Escola are entitled to immunity.

    Both are granted summary judgment on this claim.

### E.  Intentional Infliction of Emotional Distress

    Plaintiff alleges that as a direct result of the outrageous and extreme conduct of Escola

and England, he suffered emotional distress.  ECF No. 16 at 15.  Plaintiff argues Escola and

England behaved outrageously in that they continued to investigate Plaintiff even after they

knew he was not connected to the burglary, and that the purpose behind the investigation was to

manufacture probable cause so Escola and England could "get away together."  ECF No. 44 at

20.  Furthermore, Plaintiff argues Escola and England delayed in picking up Plaintiff at the jail

while they "visited Escola's family and enjoyed a dinner out together."  ECF No. 43 at 20.

Defendants argue the behavior was not extreme or outrageous and there was no intent to harm.

ECF Nos. 42 at 15; 38 at 24.

    The elements of intentional infliction of emotional distress are: (1) that the defendant

intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was

extreme and outrageous; and (3) that the defendant's conduct was the proximate cause of

plaintiff's serious emotional distress.  *Phung v. Waste Mgt., Inc.*, 644 N.E.2d 286, 289 (Ohio

(5:09CV02173)

1994). Extreme and outrageous conduct is conduct that goes beyond any possible bounds of

decency and is so atrocious that it is "utterly intolerable in a civilized society." *Yeager v. Local*

*Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) (abrogated on other grounds).  "Mere insults,

indignities, threats, annoyances and petty oppressions, or other trivialities" are insufficient to

state a claim for relief.  *Id*.  Furthermore, in order for emotional distress to be "serious," it must

be emotional injury "which is both severe and debilitating." *Paugh v. Hanks*, 451 N.E.2d 759,

765 (Ohio 1983).

 In the instant case, Plaintiff has failed to present evidence that the officers' actions

intended to cause him serious emotional distress.  Plaintiff himself alleges the officers actions at

worst were intended to devise a way to leave town together, and not to intentionally harm

Plaintiff.  Plaintiff's argument that Defendants continued to investigate him "even after they

knew that Ruble was in no way connected with the burglary" is likewise without merit.  ECF No.

44 at 20.  The record reflects Defendants continued to investigate Plaintiff in order to ascertain

whether he was involved in the burglary, and when they believed he was not connected to the

burglary, they released him.[25]

 The alleged  "extreme" or "outrageous" acts of which Plaintiff complains consists of the

---

[25]  Given Griffin's statement implicating Plaintiff in the burglary, Defendants attempted
to contact Plaintiff to investigate the possibility of his involvement in the crime.  ECF No. 44 at
5. When Defendants went to Plaintiff's last known local address, they discovered Plaintiff's
girlfriend's mother, who gave Defendants names of other people to speak to about Plaintiff, who
in turn communicated to Defendants that Plaintiff frequently engaged in criminal behavior.  ECF
Nos. 44 at 5; 32 at 30-32; 36 at 30-35.  Defendants then revisited the burglary site to determine
whether there were any additional witnesses to the crime.  ECF No. 44 at 7.  All of Defendants
aforementioned behavior in investigating Plaintiff appears to have been reasonable and proper
under the circumstances.

(5:09CV02173)

time Defendants spent together in Cincinnati before picking up Plaintiff to transport him back to Stark County. ECF No. 44 at 20. As Escola notes, Plaintiff was going to sit in jail for the evening whether it was in Warren County or Stark County, so any activity during that time did not cause Plaintiff to spend more time in jail then he would have otherwise, even if the activity could be considered outrageous. ECF No. 48 at 8. The Court does not find that eating at a pizza shop for 45 minutes then visiting Escola's daughter was particularly extreme or outrageous behavior. Furthermore, arrest and detention itself does not approach the "high standard adopted by the Ohio Supreme Court" for intentional infliction of emotional distress. *Voyticky*, 412 F.3d at 678. Defendants' motions for summary judgment are granted as to the intentional infliction of emotional distress claim.

### F. Defamation

Plaintiff alleges a claim for defamation because England "spoke to Ruble's associates in Stark County while investigating the crime, [and] she mentioned that she wanted to talk to Ruble in regard to burglary." ECF No. 43 at 21. Plaintiff further alleges "this continued at Ruble's place of work in Cincinnati, where Escola and England spoke to Rubles' coworkers regarding the burglary investigation." ECF No. 43 at 21. Furthermore, Plaintiff alleges Escola and England "allowed Ruble's co-workers to know that they had a warrant for his arrest." ECF No. 43 at 21.

To state a claim pursuant to Ohio law for defamation, a plaintiff must show: (1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory

43

(5:09CV02173)

*per se* or caused special harm to the plaintiff. *See Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.,* 611 N.E.2d 955, 962 (Ohio Ct. App. 1992). A publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." *See Hahn v. Kotten,* 331 N.E.2d 713, 718 (Ohio 1975).

In the instant case, the communication Plaintiff alleges was true and communicated during the discharge of a public duty. Speaking to Plaintiff's associates and co-workers and "allow[ing] Ruble's co-workers to know that they had a warrant for his arrest" was true and in furtherance of an investigation. Plaintiff's defamation claim therefore fails. Summary judgment is granted on this claim.

### G. Civil Conspiracy

Plaintiff alleges a claim of civil conspiracy against Escola and England. ECF No. 16 at 16. Plaintiff agrees with Defendants that this claim "rises or falls on the success of his other claims." ECF No. 44 at 21. Because a civil conspiracy involves at least two people, *see Kenty v. Transamerica Premium Ins. Co.,* 650 N.E.2d 863, 866 (Ohio 1995), and because Escola is not liable to Plaintiff on any claims, there is no potential for civil conspiracy. Furthermore, as both Escola and England were officers of the Perry Township Police Department, the intra-corporate conspiracy doctrine negates such a claim. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 509-10 (6th Cir. 1991) ("Since all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy" because the intra-corporate conspiracy doctrine does not allow a claim to be based upon the acts of the agents

44

(5:09CV02173)

or employees of the same entity); *Bays v. Canty*, 330 Fed.App'x. 594 (6th Cir. Ohio) (applying

the doctrine, used by the Sixth Circuit pursuant to federal law, to Ohio state claims).  Summary

judgment is granted on this claim.

## V. Conclusion

For the aforementioned reasons, the Court denies England's motion for qualified

immunity as to the false arrest claim pursuant to § 1983 and the state law false arrest claim.  The

Court grants the remainder of England's motion.  The Court grants Escola's motion for qualified

immunity and summary judgment in its entirety.  The Court also grants Perry Township's motion

for summary judgment in its entirety. (ECF Nos. 37, 38, 42).

Accordingly, this case proceeds only on the § 1983 and false arrest claims against

Defendant England.

IT IS SO ORDERED.


September 28, 2012                                            */s/ Benita Y. Pearson*
Date                                                  Benita Y. Pearson
                                                      United States District Judge

45